UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

UNITED STATES OF AMERICA, *ex rel.*,
ROBERT WITTENBERG, JR.,

                                        Plaintiff,

            v.

PUBLIC UTILITY DISTRICT NO. 1 OF
SKAMANIA COUNTY, a Washington
municipal corporation,

                                        Defendant.

_____

Case No. 3:14-cv-00213-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Introduction*

        Plaintiff-relator Robert Wittenberg, Jr. ("Wittenberg") filed a *qui tam* lawsuit against

defendant Public Utility District No. 1 of Skamania County ("PUD") on behalf of the United States

PAGE 1 – OPINION AND ORDER

of America (the "Government") on February 10, 2014, for a fraudulent claim under the False Claims
Act (the "Act"). On July 1, 2016, the parties reached a settlement agreement (the "Settlement"),
thereby resolving the *qui tam* lawsuit. The only issue yet to be resolved is the appropriate percentage
of the Settlement to be awarded to Wittenberg. Wittenberg seeks an award of twenty-four percent,
while the Government proposes an award of seventeen percent.

The court grants Wittenberg's motion in part and awards Wittenberg twenty percent of the
$725,236.00 Settlement, or $145,047.20, as the appropriate relator's share.

*Background*

The Bonneville Power Administration ("BPA"), a federal agency, offers a discount to rural
utility providers who service areas with a low population density in order to ease distribution costs
and stimulate electrical infrastructure maintenance and growth. (Wittenberg Decl., ECF No. 20, 2.)
Recipients of the discount are presumed to pass the discount along to their customers in the form of
lower rates. This Low Density Discount ("LDD") is awarded to eligible utilities based on a series
of calculations; a main component of these calculations is the number of pole line miles the utility
uses. *Id.*

PUD is a Washington municipal corporation which provides electricity to roughly half of
Skamania County's inhabitants. *See* <u>About Us</u>, Skamania PUD (Sep. 21, 2016, 11:10 AM),
http://www.skamaniapud.com/. From at least 2004 – and likely since the beginning of the LDD
program in the 1980s – PUD claimed the maximum discount allowed under the LDD. (Complaint,
ECF No. 1, 8, 10.) This discount was awarded based on PUD's representation that its electrical
infrastructure included 750 pole line miles. *Id.* at 16.

In 2001, Wittenberg became the General Manager of PUD. (Wittenberg Decl., 2.) At this

PAGE 2 – OPINION AND ORDER

time, Wittenberg first learned of PUD's eligibility for the LDD. *Id.* From 2004 - 2010 (except 2008), Wittenberg signed PUD's annual reports in his capacity as General Manager. (United States Mem., ECF No. 21, 5.) These reports contained the false measurement of 750 pole line miles. (United States Mem., Ex. A, ECF no. 21.) By 2009, Wittenberg had personally seen approximately seventy percent of PUD's system. (Wittenberg Decl., 3.) It was then that Wittenberg began to question whether PUD truly had 750 pole line miles and, as a result, whether PUD actually qualified for the LDD it was claiming. *Id.*

In 2009, soon after he began to suspect PUD may not qualify for the LDD, Wittenberg spoke with the PUD commission about the potentially false claim. *Id.* Wittenberg suggested mapping PUD's system to ensure PUD was not making a false claim. *Id.* The PUD commission emphatically declined to expend the resources necessary to properly map the system. *Id.* Roughly two years after questioning PUD's qualification for the LDD, PUD terminated Wittenberg. *Id.* at 4.

In September 2011, after his mapping suggestion to PUD proved fruitless, Wittenberg began to map PUD's pole line miles on his own time. *Id.* Wittenberg, with the aid of his wife, either drove or walked every pole line mile in Skamania County over the course of eight months. *Id.* Wittenberg's final tabulation of PUD's electrical infrastructure showed 440 pole line miles, significantly lower than the 750 pole line miles previously claimed by PUD. *Id.* at 5.

After measuring PUD's pole line miles, but before filing a *qui tam* lawsuit, Wittenberg pursued an employment claim against PUD. (United States Mem. at 5.) Wittenberg argued that he was wrongfully terminated due, in part, to his questioning of PUD's LDD eligibility. *Id.* Wittenberg lost his employment action due to his status as an "at will" employee. *Id.* Wittenberg filed the *qui tam* lawsuit against PUD only after Wittenberg lost his wrongful termination lawsuit against PUD.

PAGE 3 – OPINION AND ORDER

On February 10, 2014, Wittenberg filed a *qui tam* lawsuit against PUD. After filing the *qui tam* suit Wittenberg shared his pole line mile measurements and other information with the Government, allowing the Government to form a basis on which it could begin to challenge PUD's discount. (Relator Mot. & Mem., ECF No. 19, 3.) Prior to Wittenberg's actions, the Government had no knowledge of PUD's fraudulent LDD claim. *Id.* at 7. The Government eventually intervened in this lawsuit – after requesting and receiving five motions for extension of time – but Wittenberg remained engaged throughout the proceedings. For example, Wittenberg shared all of the mapping he had done of the pole line miles with the Government. *Id.* at 3. Additionally, Wittenberg regularly answered questions from Government investigators, explained technical concepts, and reviewed PUD responses to Government inquiries. *Id.* Wittenberg met in person with Government representatives multiple times, had multiple phone conversations with the same representatives, and regularly corresponded with them via email. (Wittenberg Decl. at 5.) Finally, Wittenberg sifted through PUD audio recordings to find evidence showing PUD knew that it may not qualify for the LDD. (Relator Mot. & Mem. at 4.) Wittenberg's counsel facilitated many of these encounters.

Sometime before October 14, 2014, Government representatives met with PUD and its representatives to discuss the Government's investigation. (United States Mem. at 3.) At this meeting, PUD informed the Government that PUD had contracted an outside firm to calculate PUD's pole line miles. *Id.* The Government agreed to allow the third-party firm to finish its measurement before commencing settlement negotiations. *Id.* However, there is no indication the Government incurred any expense related to the third-party firm. The measurement ultimately produced by the third-party firm showed PUD actually had in place 527 pole line miles. *Id.* This number is 223 miles, or thirty percent, lower than the 750 pole line miles originally claimed by PUD, and 87 miles,

or seventeen percent, higher than the 440 pole line miles as measured by Wittenberg. Wittenberg was able to confirm many of the third-party firm's figures, thus reconciling much of the difference between the three measurements. *Id.* at 5. Due to PUD's 527 pole line miles, PUD qualifies for a 4.5% discount, rather than the 6% discount PUD had previously claimed. *Id.* at 4.

After several months of discussion, the parties – Wittenberg, PUD, and the Government – entered into the Settlement agreement on July 1, 2016. Under the Settlement, PUD agreed to pay the Government $725,236.00. (United States Notice of Election to Intervene, ECF No. 24, 4.) The Settlement was based on the 527 pole-mile measurement reached by the independent firm, rather than upon Wittenberg's calculation of 440 pole line miles. (United States Mem. at 3.) The only issue yet to be determined is the appropriate percentage of the Settlement to be awarded to Wittenberg.

*Legal Standard*

The False Claims Act (the "Act") states that relators of claims which ultimately prove successful after Government intervention are entitled to receive fifteen to twenty-five percent of any settlement or judgment the Government recovers. 31 U.S.C. § 3730(d)(1). The Act provides the percentage awarded to the relator by the court depends "upon the extent to which the [relator] substantially contributed to the prosecution of the action." *Id.* The fifteen percent award is generally treated as a finder's fee to which the relator is entitled even if the relator's only involvement is to file the suit. *United States ex rel. Alderson v. Quorum Health Grp.*, 171 F. Supp. 2d 1323, 1331 (M. D. Fla. 2001). The upper region of the available percentage range is reserved for those relators who develop all the facts, furnish the supporting documentation, and continue to play an active and important role in the litigation. *United States ex rel. Johnson-Pochardt v. Rapid City Reg'l Hosp.*,

2003 DSD 3, 252 F. Supp. 2d 892, 897.  The maximum reward – the full twenty-five percent – is

reserved for those who "actively and uniquely assist the Government in the prosecution of the case."

*United States ex rel. Burr v. Blue Cross & Blue Shield of Florida, Inc.*, 882 F. Supp. 166, 168 (M.

D. Fla. 1995).

Courts look to two sources as guides to determine the appropriate percentage to award a

victorious relator: legislative history of the Act and "Relator's Share Guidelines" ("Guidelines")

promulgated by the Department of Justice ("DOJ").  *United States ex rel. Johnson v. Universal*

*Health Services, Inc.*, 889 F. Supp. 2d 791, 794 (W.D. Va. 2012).  Though these sources are non-

binding, they are instructive.  *Id.*

I.  Legislative History.

The first piece of legislative history to consider is a statement made on the floor of the House

of Representatives (the "Statement").  *Id.*  The Statement details the motivations behind the most

recent amendments to the Act.  *See, e.g., Johnson-Pochardt*, 2003 DSD 3, 252 F. Supp. 2d at 897.

Representative Berman stated the following:

> In those cases where the person carefully develops all the facts and supporting
> documentation necessary to make the case and presents it in a thorough and detailed
> fashion . . . and where that person continues to play an active and constructive role
> . . . the Court should award a percentage substantially above 15% and up to 25%.

132 Cong. Rec. H9382-03 (1986).  Compare this standard to a situation where a relator only files

the claim, and then allows the Government to perform all of the pre-trial and trial work.  In this

scenario, the relator would only be entitled to the minimum recovery.  *Johnson*, 889 F. Supp. 2d at

794.

A second piece of legislative history to consider when determining the appropriate relator's

share of a settlement or judgment is the three factors provided by the Senate (the "Senate Factors"). *Id.* The Senate Factors include: 1) the significance of the information provided to the Government; 2) the contribution of the person who brought the action to the results obtained; and 3) whether the information which formed the basis of the suit was known to the Government before the suit was filed.  S. Rep. No. 99-345, at 28 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5293.

Case law clarifies the Senate Factors.  Information provided by the relator is significant if the relator's complaint identifies the basis for a large percentage of the amount the Government ultimately recovers.  *United States ex rel. Shea v. Verizon Commc'ns, Inc.*, 844 F. Supp. 2d 78, 81 (D.D.C. 2012).  Information provided by the relator is also significant if the relator is able to provide a considerable amount of evidence.  *Johnson-Pochardt*, 2003 DSD 3, 252 F. Supp. at 897-98.  A relator's contribution leads to an increased percentage of the ultimate award when, for example, the relator completes several lengthy interviews with the Government, *id.* at 899, hires experienced *qui tam* counsel, *Alderson*, 171 F. Supp. 2d at 1332-33, and brings a substantial amount of expertise in the field on which the Government relies in proving its case, *Shea*, 844 F. Supp. 2d at 82-83.

II.  Guidelines.

Courts consistently have looked to the Guidelines to assist in determining the appropriate percentage to award a victorious relator.  The Guidelines provide two sets of factors: one set is used to increase the award, and one set is used to decrease the award.  *See* 11 *False Claims Act and Qui Tam Quarterly Review*, Oct. 1997, at 17-19.  The Guidelines are not mandatory authority; they are "merely internal standards."  *Alderson*, 171 F. Supp. 2d at 1333.

/ / / / /

/ / / / /

PAGE 7 – OPINION AND ORDER

*A.  Factors Favoring a Larger Relator's Share*

Factors in favor of increasing the relator's share beyond the minimum fifteen percent include:

(1) The Relator reported the fraud promptly; (2) When he learned of the fraud, the Relator tried to stop the fraud or reported it to a supervisor or the Government; (3) The *qui tam* filing, or the ensuing investigation, caused the offender to halt the fraudulent practices; (4) The complaint warned the Government of a significant safety issue; (5) The complaint exposed a nationwide practice; (6) The Relator provided extensive, first-hand details of the fraud to the Government; (7) The Government had no knowledge of the fraud; (8) The Relator provided substantial assistance during the investigation and/or pre-trial phases of the case; (9) At his deposition and/or trial, the Relator was an excellent, credible witness; (10) The Relator's counsel provided substantial assistance to the Government; (11) The Relator and his counsel supported and cooperated with the Government during the entire proceeding; (12) The case went to trial; (13) The FCA[1] recovery was relatively small; (14) The filing of the complaint had a substantial adverse impact on the relator.

*United States ex rel. Simmons v. Samsung Elec. Am., Inc.*, 116 F. Supp. 3d 575, 580 (D. Md. 2015).

*B.  Factors Favoring a Smaller Relator's Share*

Factors in favor of decreasing the relator's share include:

(1) The Relator participated in the fraud; (2) The Relator substantially delayed in reporting the fraud; (3) The Relator, or relator's counsel, violated FCA procedures; (4) The Relator had little knowledge of the fraud or only suspicions; (5) The Relator's knowledge was based primarily on public information; (6) The Relator learned of the fraud in the course of his Government employment; (7) The Government already knew of the fraud; (8) The Relator, or Relator's counsel, did not provide any help after filing the complaint, hampered the Government's efforts in developing the case, or unreasonably opposed the Government's position in litigation; (9) The case required a substantial effort by the Government to develop the facts to win the lawsuit; (10) The case settled shortly after the complaint was filed or with little need for discovery; (11) The FCA recovery was relatively large.

*Id.* at 580-81.

/ / / / /

---

[1]The District of Maryland refers to the False Claims Act as the "FCA" in this case.

*Discussion*

Applying all relevant considerations, the court concludes Wittenberg is entitled to a twenty percent share of the $725,236.00 Settlement.  This percentage recognizes both Wittenberg's contributions to the Government's case and the Government's ultimate utilization of information provided, in large part, by a third party.

## I.  Legislative History Supports an Award Closer to the Statutory Minimum than the Statutory Maximum.

The principles from the Statement support this conclusion.  The Statement focuses on the careful development of all the facts and the supporting documentation, as well as the active and constructive role of the relator throughout litigation.  Here, Wittenberg did not develop all the relevant facts, nor were the facts generated by Wittenberg fully accurate.  Instead, an independent third-party worked with PUD to accurately determine the relevant facts.  The measurements generated by the independent third-party are higher than those developed and presented by Wittenberg, and the negotiations and ensuing Settlement were based on the third-party firm's figures, not Wittenberg's.  For these reasons, Wittenberg should be awarded a percentage closer to the statutory minimum than the statutory maximum.

The Senate Factors also support awarding Wittenberg a percentage of the Settlement closer to the statutory minimum than the statutory maximum.  The information provided by Wittenberg was only somewhat significant.  While the information concerning PUD's pole line miles was beneficial to the Government, Wittenberg's information proved to be inaccurate.  Wittenberg's contribution was not vital to the result ultimately obtained.  Though Wittenberg has considerable experience in the field, the case was settled mainly due to the efforts of a third party,

PAGE 9 – OPINION AND ORDER

and negotiations between representatives of the Government and PUD. Wittenberg did verify some of the figures provided by the third party, which allowed the Government to have confidence in the facts presented and ultimately relied upon to settle the case. Thus, this factor weighs in favor of a percentage award greater than the statutory minimum, but not considerably so. Finally, it is undisputed the Government had no prior knowledge of the information which formed the basis of the suit. Taken together, the Senate Factors and the Statement support awarding Wittenberg an award closer to the statutory minimum than the statutory maximum.

## II. The Guidelines Support an Award Roughly in the Middle of the Statutory Minimum and Maximum.

### A. Factors favoring a Larger Relator's Share

Of the fourteen factors promulgated by the DOJ favoring a larger relator's share, seven factors weigh, to varying degrees, in Wittenberg's favor. Five of these factors heavily weigh in favor of a larger relator's share, while the other two factors only nominally weigh in favor of a larger relator's share. The first factor weighing heavily in favor of a larger relator's share is Wittenberg's reporting of the fraud to the PUD Commission – his supervisors – soon after Wittenberg began to suspect fraud. The second factor weighing heavily in favor of a larger relator's share is the effect the *qui tam* filing had on the fraudulent practice. Soon after Wittenberg's *qui tam* filing and the resulting Governmental inquiry, PUD ceased to fraudulently claim the maximum discount offered by the BPA. The third factor strongly in favor of a larger relator's share is the Government's undisputed lack of prior knowledge of the fraud. For the fourth factor, Wittenberg and his counsel supported and cooperated with the Government throughout the proceeding, Wittenberg promptly answered any questions posed by the

PAGE 10 – OPINION AND ORDER

Government, and Wittenberg and his counsel were always available to the Government. Perhaps most importantly, Wittenberg provided the government tape recordings of PUD Commission meetings. Wittenberg presented the Government concrete proof the PUD Commissioners knew about the potentially fraudulent pole line mile measurement, thus arming the Government with an important tool in the settlement negotiations with PUD and the Government. The fifth factor, the recovery under the Act, was relatively small. These five factors heavily weigh in favor of a larger relator's share.

The two other factors favoring a larger relator's share are more complicated. The first of these factors – the promptness in which the relator reports the fraud – requires context. Wittenberg began to suspect fraud in, at the latest, 2009, but had no evidence to support his suspicion. Wittenberg did not file his *qui tam* suit until 2014, roughly five years after he first began to suspect fraud. In most situations, a five-year window between formulating a belief and reporting that belief is not considered prompt. However, the circumstances do not necessarily militate toward decreasing Wittenberg's award because Wittenberg needed time to confirm his suspicion by actually determining whether PUD qualified for the discount. Wittenberg first attempted, to no avail, to persuade PUD to ensure that it actually qualified for the LDD. When PUD was not responsive to his concerns, Wittenberg took affirmative steps to measure PUD's actual pole line miles. His measurements took time, because he worked on his own to cover the 527 pole line miles strung across a forty-mile-wide county, counting poles one mile at a time. Additionally, Wittenberg raised the issue of potential fraud to his supervisors soon after he began to suspect the fraud. However, Wittenberg did not file his *qui tam* complaint until after he lost an employment claim against PUD, which suggests Wittenberg could have filed his *qui tam* suit

PAGE 11 – OPINION AND ORDER

earlier. Considering the circumstances, this factor weighs in favor of a larger relator's share of the award, but only nominally so.

The final factor weighing in favor of a larger relator's share also requires closer examination. This factor requires examination of the degree of assistance the relator provided to the Government during the Government's investigation or other pre-trial phases. Here, there is no doubt Wittenberg expended a considerable amount of time and energy on his investigation, particularly concerning personally mapping PUD's pole line miles. Additionally, Wittenberg assisted the Government by answering complicated Governmental queries; confirming information obtained from other sources; regular communication, including emails, telephone conversations, and face-to-face meetings; and finding a key piece of evidence implicating PUD commissioners. However, great expenditure of time does not always equate to substantial assistance. Particularly relevant is the Government's ultimate reliance on pole line mile measurements provided by another source, not the measurements provided by Wittenberg. Also relevant is the difference in effect of Wittenberg's measurements and the measurements provided by the independent third-party and ultimately relied upon by the Government. Had Wittenberg's measurements proved accurate, PUD would not be eligible for any discount under the current LDD scheme and the Government would have been able to recover greater damages from PUD. However, the measurements provided by the independent third-party determined that PUD actually qualifies for a discount of 4.5%, rather than the 6% discount PUD claimed based off of falsely reported pole line miles. Thus, though Wittenberg exerted great personal effort on the matter, his assistance on this specific point, while substantial, was only marginally so. All other factors favoring a larger relator's share are either not implicated by the facts or do not favor

PAGE 12 – OPINION AND ORDER

Wittenberg.

### B. Factors Favoring a Smaller Relator's Share

Of the eleven factors promulgated by the DOJ favoring a smaller relator's share, two factors are implicated here. First, Wittenberg passively participated in the fraud. Wittenberg's participation in the fraud was not active because he did not knowingly present a fraudulent claim. Yet, Wittenberg signed the PUD annual report from 2004-2010 (except 2008). Wittenberg began to strongly suspect fraud in 2009. Thus, on one or two occasions, Wittenberg signed PUD's annual report even though he suspected the report was fraudulent. However, failure to verify numbers the signee of a document believes may be fraudulent should not weigh as heavily toward awarding a smaller relator's share as does active, knowing participation in the fraud. Thus, this factor is implicated, but it does not weigh heavily in favor of awarding a smaller relator's share. Second, the case came to a resolution with little need for discovery. An independent third party performed much of the investigation – at no cost to the Government – and Wittenberg only engaged in a limited amount of informal information sharing.

### III. Taken Together, the Legislative History of the Act and the Guidelines Support an Award of Twenty Percent.

The two main sources of guidance in determining the appropriate percentage to award a successful relator – legislative history of the Act and the Guidelines – support an award of twenty percent. The circumstances in this case, as applied to the principles from the Statement and the Factors, call for an award on the lower end of the statutory spectrum. The Guidelines serve to further raise the award above the statutory minimum. Thus, awarding Wittenberg twenty percent of the Settlement is appropriate. Accordingly, the court finds the appropriate amount of the

PAGE 13 – OPINION AND ORDER

relator's share of the $725,236.00 Settlement is twenty percent, or $145,047.20. This award recognizes both Wittenberg's contributions to the case and the substantial effort and information provided by other parties.

*Conclusion*

The court GRANTS Wittenberg's motion (ECF No. 19) in part. The court awards Wittenberg a relator's share equal to twenty percent of the $725,236.00 Settlement, or a sum of $145,047.20.

DATED this 1st day of November, 2016.

JOHN V. ACOSTA
United States Magistrate Judge

PAGE 14 – OPINION AND ORDER